for appellant. I'm going to address the Batson questions. Mr. Goldrosen is ready to address the other issues, time permitting, and is prepared to answer any questions from the Court regarding it. Fine. Thank you. May it please the Court. The place I would like to start is with the system that was used by the prosecutor in this case for exercising his peremptory challenges. Because unlike many cases, there are two critical points in time which must be focused upon. The first of which took place during the individual voir dire of Ms. Casey, who was the juror who was extruct by the prosecutor during the case. It was at that point that the prosecutor made a decision regarding the removal of Ms. Casey. It was a month later when the Ms. Casey was placed in the jury box that the exercise of the peremptory actually took place. And that was because of the rating system utilized by the prosecutor, which was the eight-level four checks to four Xs. Four checks being the best, four Xs being the worst. What that meant was that a four-check juror would never be challenged peremptorily by the prosecutor, although it might be removed by the prosecutor. And if the juror received two Xs or two checks, he couldn't tell at that point, because it wasn't until he saw the jurors in the box that he would be able to evaluate whether or not it was loaded towards Xs, and therefore maybe a single X would survive, or loaded towards checks, in which case a single or two checks might survive. Let me step back in terms of the structure of this case for a moment, okay? We have findings by the district court. The findings, as I understand them, is that there was a prima facie case made out. Do you understand that to be a fact-finding that we would review for clear error? Yes, Your Honor. And the second one is that there were, at the end of the Batson inquiry, that there were mixed motives. Is that also a fact that, in other words, that he had both racial motives and non-racial motives? Well, was that a finding of fact? Yes. I don't think there were any facts to support that finding. Because you think that it wasn't mixed. You think it was not, in fact, a mixed motive. I don't think that there was any mixed motives that were ever articulated. The prosecutor in this case never articulated any motives whatsoever. So that's what – because I'm trying to see why you think this process thing matters, because if we got to – if we thought there were mixed motives and accepted that and reviewed that for clear error, then the only thing that ultimately would matter is whether that was, in fact, correct, and then whether his finding that they rebutted that was correct. And I'm not sure all the intermediate stuff would matter that much. But your argument is essentially that the motives weren't even mixed. That there was no possible – and I think that the – in fact, your opinion in that case, and the concurrence by Judge Wardle as well, that addresses that in order to have a mixed motive, you have to have an articulation by the prosecutor of mixed motives. There has never been an articulation by the prosecutor in this case of any reasons whatsoever, no reasons for exercising the peremptory challenge, nor any reasons for giving Ms. Casey the rating he did, which led to the peremptory challenge. So in our view, there cannot have been any mixed motive analysis which would properly be applied in the case. All right. And I was just trying to see how this fit in to the ultimate problem. Well, the ultimate – in our view, the ultimate problem is whether or not we approved discrimination by a preponderance of the evidence, because, first of all, I think there's some problems with deference to the trial court decision, if we go back to that. I think that Johnson v. California has really swept aside the exception that was carved out in Wade v. Terhune for pre-1994 cases, because in Wade, this court held that the California Court of Appeals in a case by the name of Fuller had equated the strong likelihood with the reasonable inference requirement. And I think in Johnson v. California, and in particular in footnote 2 of the Supreme Court's decision, it clearly states that that's just – that's not a reasonable finding, and therefore, there's no deference due to the trial court whatsoever. With regards to the district court in this case, it's our view that the judge has there – this mixed motive analysis is completely inappropriate, that there was a finding based on some kind of inference, some speculation that the prosecutor had articulated a reason. We don't think that that – that's simply not the fact. I think Paulino, by this court, and Johnson clearly hold that you cannot substitute some circumstantial evidence for the reasoning of the prosecutor. You can use circumstantial evidence at the third batch and step in order to evaluate the overall case, but you can't take circumstantial evidence and substitute that, or speculation as it's described in the Paulino and in Johnson v. California. You can't substitute that speculation for some actual reason by the prosecutor. But if the prosecutor can't remember, and unless there's a finding that the prosecutor lied, and that was not the finding here, at step two, under Yee, in our circuit, doesn't – don't we just then move on – that counts against the prosecutor and don't we move to step three? Yes. Yee, I think that that's exactly right. It counts against the prosecutor, and so we look at the entire – the entire record to see what evidence there is of discrimination. But you're nonetheless arguing – are you arguing with regard to mixed motive analysis? Because it seems to me to be critical here, that because he didn't articulate it, there cannot be a mixed motive analysis, one, or two, there should never be a mixed motive analysis, a la my concurrence in Kessler v. Canberra, or three, that he failed a mixed motive analysis. Either because the x excess – four x's suggest that the racial reason was the real reason, or something else. There are three different possibilities, it seems to me. I happen to agree with the second, but I think the critical one is the first, because no mixed motive was ever articulated in this case. Every mixed motive case in other circuits, and the concurring opinion by Judge Wardlaw in the Kessler case, holds that in order to have a mixed motive analysis, there must be actual mixed motive articulated. In that rare case where a prosecutor or an adversary stands up and says, yes, I counted race, but I also said this, that's when mixed motive analysis applies. And it is not – I'm sorry. If we disagreed, just hypothetically, if we didn't agree with that, and if we didn't adopt the no mixed motive applies to Batson theory, and we get to the third possibility, as to which there was a fact-finding by the district court, then what? Do you say he was clearly erroneous as to his fact-finding? Yes. It's just absolutely – it cannot be correct that you can find a mixed motive when no mixed motive has been articulated. Well, I know, but I'm trying to skip that. I mean, suppose we didn't agree with that. We thought that you could – Well, I think – then I think you go back – if accepting that argument, that there were two motives, what was the predominant motive? If that's the question, then I don't think there's any question that race was. And I think that takes us back to the four X's. When this man met Ms. Casey, he gave – he rated her the worst juror that he had yet seen in the entire panel, flat out. He testified at the evidentiary hearing and in his deposition that he was looking for homeowners, solid citizens, people who have something to lose, people who worry about crime. This juror met that definition to a T, unless you meant by solid citizen, white solid citizen. Because otherwise, you have a 58-year-old woman married to an employee of the State of California Office of Insurance, military veteran, 17 years at the same home, owned her own home based on the inference that she read Homeowners Magazine or subscribed to it, along with Better Homes and Gardens and Country Home, worried about crime, thought crime was bad, thought drugs and street gangs were serious problems that she had to address in her children. So taking all of that, the simple fact that this man rated this juror the very worst juror he had met out of 50 jurors, there can be no other fact that correlates with that rating as well as race. And that's the language out of Miller-El, that you simply had someone here for whom there is no other explanation for rating her the very worst juror in the entire book. Mr. Spiegel, that's your view of the situation, but that's not a fact, is it? Is it a fact that she is not the worst juror? Is it a fact that we don't know what, he didn't tell us what his four X's, I mean, he told us what they stood for and how he arrived at it, but we don't know why he wrote four X's for Ms. Casey, do we? What we know... On this record? What we know is what he wrote down next to the four X's, because he said those were the reasons. So where did those come from? With other jurors, he wrote down, never vote death penalty, might vote death penalty in some cases. Here, he made some cryptic comment that no one is really able to interpret regarding not being able to set aside something. He wrote down transportation. In our view, these were setting up pretext answers, because once he read it, rated her four X's, he knew he would exercise a peremptory challenge. He knew that he might face a question about it. So he... He was trying to be duplicitous. He just wouldn't put the four X's. He could have put two X's. I don't think he thought anyone would ever see those four X's. He wasn't certainly going to stand up when asked after exercising his peremptory, should he have been challenged, and say, well, the reason I did it is because she's the very worst juror in the veneer. I doubt very much he was going to say that. What he was going to say was, she has transportation problems. He's going to say, I challenged her for cause, for death penalty, because setting up an explanation for his peremptory challenge when the time came. I think if you go back and look... At that juncture, Clark had already been... What, dared or not? Not. No. No, she can't. She had not. All right. So the comparison at that point doesn't include Clark. It includes Clark because Clark was seated between... Her voir dire, I'm sorry. Her voir dire had not taken place at that point. So the four X's, the worst of anybody yet doesn't include Clark. Nor does it include Smith, the other four X's. It was at that point, she was the worst, and he knew it meant that he would exercise a peremptory challenge. If you look at his conduct from that point on in the light that he knew he was going to exercise a peremptory challenge, it places his gas chamber questions in perspective because he's searching for a way to explain the peremptory when he makes it. He's looking to get an answer out of her that might give him an explanation for exercising the peremptory if he can't get a cause. But that sort of overreaches, doesn't it? Because what that says, if you assume that the prosecutor has some preordained racial bias, then you can say any time they ask legitimate questions, pursue legitimate lines of question, they're looking for a race-neutral reason to get them out so that they don't have to resort to their race-based reason. I can't look inside the mind of an attorney who does that. Well, you just did. You have been. But I draw that inference from his forex. Yes, but that's what I'm saying. You are looking inside his mind, and therefore everything, based on your assumption of what the forex is, means that everything thereafter is a pretext, including his voir dire. Well, what we know for a fact, I think we can take as a proper inference, is that once he said put forexes on there, he was going to exercise a peremptory. Well, let me ask you that. That's a forex. Okay, I tried jury cases. We had jury consultants. I didn't try criminal cases. But we, and we didn't get as much advance notice on jurors. But to the extent we did get any kind of profile, we had a pro forma anticipatory notion of who we were likely to suspect on the jury. So we would, however we recorded those, I didn't use Xs or anything like that. But that was first cut based, and here there's a lot of information because there's a questionnaire. So you go through the questionnaire, and you come to a conclusion that what you see bothers you. And so what is seen here bothers him on the questionnaire. And he cites, he does say DP, and he says transport problems. I think that the record shows that those notations came after. After the voir dire. Okay, but in any event. So he has his forexes. And you're arguing that based on that, the Xs were based on the questionnaire, right? No. Oh, those came after. Voir dire. Voir dire. So he had met her at that point. How is it, I thought you started out by saying that the rating system that he used foreordained, and then it got exercised at voir dire. Maybe I misunderstood your sequencing. She was interviewed in January of 1989, January 11th. Parenthetically, she was called back and placed in the box in February. I see. Okay. So he made his forexes at the conclusion of her individual questioning. And then when the time came a month later, he simply looked at his forexes. And based on who was in the box and what the individual jurors he had, the ratings he had, he went with his lowest rated juror of the 12 that were then sitting. The significance of forexes is that will always be the lowest rated. That will certainly be, if that juror sits, there's no 5X to compare that person to. So at the point that he puts forexes, he knows that when she comes to court, she's going to have a preemptory challenge against her. That's my point, though. I mean, you go through and you make a judgment, and then... So what's the foundation for the judgment of forexes on this particular juror? We'll never know. Well, we only have the record before us. We have who she was, she fit his juror profile perfectly, and we have her death penalty views. But if you go back, because I did this, and figure out who was before she was. One has to assume that while the, that the preemptory challenges sort of reflect a moment in time, right, in terms of what their projection is going to happen afterwards, how far they are down the preemptory list and so on. But if you go from when she was there backwards, and leaving aside the excess of the checks, but looking at what actually happened. What actually happened, it seems to me, is that on the death penalty sort of scale, there were people who seemed to be more favorable to the prosecution than she who were preemptorily challenged early on. And one can assume that he was early on being more protective of himself than he was as time went on, because he was going to have to deal with fewer preemptories as time went on. But there was certainly, I saw no way of looking at that array of thinking that he was singling her out on her death penalty view. She seemed to be either in the middle or high in terms of being anti-prosecution of the bunch of people who were preemptorily challenged from her back. Well, they varied. I think it's really, it's really the answer. And I don't think it's the answer. Because he so clearly followed the rating system and how he actually used it, we have to go back and look at how people's death penalty views compared to their checks or Xs. Why? Why don't we just look at how their death penalty views compared to each other as it turned out? Because that isn't how he evaluated jurors. He evaluated jurors on some kind of global scale. And the two jurors who actually sat, Clark and Kruger, show this, because their views are either more anti-death penalty than Ms. Casey's or indistinguishable. But they were later, too, right? Ms. Clark actually was placed in the jury box between the time that he exercised the preemptory challenge of Casey and when the trial judge made his decision on the Wheeler motion. So she was actually in the box and had been passed once or twice. And so was Casey. She was passed, too. She was passed once. I view that as part of his pretext because he chose this other juror, Lester, who had one check one time and then went back and preemptory challenged Casey. Now, when did Smith come into the picture? Smith was voir dired after Ms. Casey. She got four Xs. And she got four Xs. That's correct. But she was voir dired after Casey. Where she was, we can find that because it's in the magistrate judge's recommendation, has the order in which the challenges were. So what do you make of the four Xs for Smith? I'm just trying to make sure I understand when you assigned the four Xs. This is a woman who had difficulty with reasonable doubt. This is a woman whose death penalty views were extremely anti-death penalty. And this is a woman who had problems with. Because she deserved, in your view, she deserved four Xs and there's nothing terrible about four Xs. I don't think it was a reason. She had one who had problems with the police about something. Yes. She had an eyewitness. Her husband had been identified by an eyewitness as having been a crime, having committed a crime, and it took them some period of time for them to realize that the eyewitness identification was wrong. And it had put her family through a tremendous amount of trauma. And she was very doubtful of eyewitness identification. And the prosecutor was going to put on a very shaky eyewitness identification. I have one additional question. The one thing I thought was very odd in the questionnaire and in the questioning was this focus on the movie A Color Purple. Now, you never may say anything about this, nor does the prosecution. But, you know, if I had an intuition about this, it would be that her answer to that was what was really bothering him more than her race as such. And I don't know. Go ahead. This was a person who, this was a black woman who, frankly, described that she had seen discrimination in her life. I thought that her answer to the questionnaire where it asked about prejudice and bias, and she thought that there was prejudice and bias in the country as a whole. However, not in Placer County. She was really quite moderate. There was one other question that all jurors were asked about whether or not black Americans had made too much, the right amount, or too little progress in society. And her answer was the right amount. Do we happen to know where this Color Purple question came from in the questionnaire? Do we know anything about how the questionnaire was made up? Your Honor, I don't recall. We may have it somewhere in our files. It was actually the judge who asked her the verbal question, not the prosecutor, which I thought was interesting, too. But the question seemed strange to me. The question from the judge himself? Well, in the questionnaire and from the judge. It was one that they were using, apparently, to see whether or not there was any racial bias in any of the jurors, I presume. I don't frankly remember. Mr. Spiegel, as we decide the Babson issue, what is the narrow question before us? I think that the narrow question is whether or not. I think, I frankly think that this is de novo review, because I don't think deference is due to the trial court decision. And I think that this Court reviews denial of habeas corpus de novo in this here. And so it is whether or not there was purposeful discrimination in the rejection of Ms. Casey as a juror. Go ahead. And as we decide that question, what do we look to? Don't we look first to what is a preemptory, what's the purpose of the preemptory challenge? What was the prosecutor's purpose? No. What does it stand for? Why do you have a preemptory? I'm afraid. Don't we start there? You get rid of anybody you don't want on the panel for any reason that you may have, except a reason that's prohibited by the Constitution. Now, is that a fair statement? I believe that is exactly the correct statement of the law, Your Honor. What do we do with the trial judge's notations and analysis? That was at the prima facie case. But do we just ignore that then, since he didn't ask the, didn't move on to hear any articulation and require the prosecutor to articulate a non-race basis? Why don't we give that at least some weight? Well, I think the Johnson v. California points to the fact that the wrong standard was being used, and so there's no weight given for that reason. Well, I understand that he had the wrong standard. But nonetheless, what he is doing is he's reacting. Right. His notations and his statement go to his observation about what he, how he reacted. Now, the extent to which that weighs in, in a Johnson-type analysis is an aspect. But nonetheless, it's a contemporaneous observation of the judge's reaction to voir dire. So I don't know how we can discount that, how much we can discount it in any event. Well, I think that it was an unreasonable, systematic approach by the judge at that point, because although he was making observations of the jurors, the issue before him was whether or not the defendant had raised an inference of discrimination. The defendant presented a multitude of evidence, including the prior strike in a previous capital case, and presented that as a pattern. And also as evidence in itself, given the comments that were made that were presented on the record. But actually, some of that information and some of the information that the district court here relied on was actually wrong. I mean, for example, that he only raised, that this gas chamber questioning point was actually done three times, not just once. And, I'm sorry? Well, I don't think that, I think that the point that they make, if you go back and look at it, it was made a reference in passing. It was never in a question posed to a juror directly, as the prosecutor actually did. The prosecutor said, can you send this man to the gas chamber? The defense attorney at one point made a passing reference to the gas chamber. I'm going to talk about the defense attorney. My understanding is the prosecutor asked him more than once. And also, with regard to challenges for cause, there was more than one challenge for cause based on the death penalty. So some of the details were wrong. But more than that, what, on the other hand, doesn't Johnson say flat out that you don't, it doesn't matter, what the trial court thought would have been good reasons is just irrelevant, because the question is what reasons did he have, not what would have been good reasons. I think that's correct, Your Honor. I think it addresses the wrong question. The fact that they, first of all, it addresses the wrong question regarding the evidence of reasonable inference. But exactly. It also attempts to substitute the judge's perceptions of what the prosecutor might be thinking for actually finding out from the prosecutor. Your Honor, I'm low on time. I'd like to reserve time for rebuttal. I want to continue your questions if that's okay with you. No, no. You focused on the issue that obviously is troubling the panel. Does your colleague want to say anything that isn't in the briefs? Because we have read the briefs thoroughly, analyzed all of the issues. So unless there's something that you need to put on the table that we need to be brought up to speed on, you can save your time for rebuttal. Thank you. We have five minutes for rebuttal. I'll give you five minutes for rebuttal. So if you have something to say as the clock ticks down. Well, I'm available. Why don't I just say that I'm available for any questions if any of the other issues that the court may have. I think with the limited amount of time here, I couldn't really start to make No, that's why I said if there's some burning issue. We have, I can assure you, thoroughly, thoroughly gone through this record and the arguments. I think that the briefs cover the issues, but I'm available for any questions. Okay. Judge Farris? No. Okay. Fine. Good morning, Your Honors. Deputy Attorney General Eric Christofferson on behalf of the warden. Obviously, this court is focused on the Batson issue, and so obviously, that's what I'm prepared to talk about mostly. And what I'd like to start off with is the district court's finding in this case that indicated that the district court's description of Juror Casey indicates as judged as a whole, her voir dire demonstrates Casey's repeated and substantial doubts about whether she could, in fact, vote for the death penalty. The prosecutor was not, on account of her race, obligated to ignore her doubts and indecision. And indeed, every court, every judge that has evaluated Mrs. Casey as a juror has indicated or has concluded that she was not a good prosecution juror. The trial court in this case, when he ruled on the motion, on the Batson or the Wheeler motion that was raised, indicated, found that she was indecisive. He wasn't sure that she could follow the law, and he clarified that he didn't mean that she was, that he felt that she should have been excused for cause, but he felt that he wasn't, there was at least a question in the trial judge's mind about her ability to set aside her feelings about the death penalty. Do you have any reason to question what the trial court said and what he did? Because when the motion was made to dismiss her for cause, he denied it. If she couldn't follow the law, wouldn't that be cause to kick her off? Yes, Your Honor, that would be cause to kick her off. And I think that the trial court clarified that he didn't think that she was going to automatically vote. He didn't believe that she was sufficiently, her beliefs about the death penalty sufficiently impaired her such that she would be a poor death penalty or would be subject to excusal for cause. However, he clearly recognized, and as the district court recognized, that she did have substantial doubts about her ability. Whether that rose to the level sufficient to exercise a challenge for cause or to grant a challenge for cause, the trial court clearly came down on the side that, no, it wasn't that enough. Because she had indicated at times that she could try to be fair, that she could set aside her beliefs. And so under those circumstances, the trial court just recognized that she had some problems from the standpoint of the prosecutor. What about, to go back to the exes and the chicks, it is sort of stark if you compare her to Ms. Clark. I mean, A, that their answers both seemed to be in the same general ballpark, i.e., a certain amount of equivocation followed by, but yes, I could do it. But more than that, she ends up with four Xs and Ms. Clark ends up with, what, three and a half chicks or something. What does that say to you? Well, I think it says a number of things. One, as far as Ms. Clark, if anything, Ms. Clark's rating was anomalous to everybody else, to all of the numerous. That seems to me to be right, but what does it tell you then? I mean, it's hard to figure out why that was so. I agree with that. Right. Well, I think it indicated, as the prosecutor indicated at the evidentiary hearing, that he looked at the whole package. He focused, certainly the death penalty, as he indicated and as trial counsel indicated, was the main focus of Vordaer, that he did look beyond that. That he considered the demeanor, the extent that he was, as he put it, I looked at everything that lawyers are going to consider in evaluating a juror for a peremptory challenge. And so the extent that he was able to develop a rapport with them during the course of the questioning, because he did individually question both of those jurors, and those aspects are likely, went into his rating. But he can't tell. He was unable to recall or tell us anything. So what we have is sort of this piece of paper that, as Judge Berzon is saying, is such at odds with Clark. Now, maybe he super-rated Clark, but if it's going off on the death penalty view, she was at least as skitzy on that as Casey seemed to be. She did have some problems. In fact, she had a religious predilection against it. She was Catholic. Exactly, Your Honor. And actually, her views, and again, this is, we're just trying to draw inferences from the record. The prosecutor could have felt that her, because she had a specific objection to the death penalty based on religion, that that might have been something that he would be able to overcome, as opposed to a general, I don't like the death penalty view that Mrs. Casey has passed. The decisiveness criteria doesn't ring too true, because you would think that if you had to choose between two moderately anti-death penalty people, you'd like the less decisive, not the more decisive one. No? In terms of, the view would be that Mrs. Casey would decide that she's against, Mrs. Clark would decide that she was against the death penalty. I thought that was very odd business, because if you have people whose predilection is to be against a death penalty, you'd want the ones who are more likely to be more persuadable. In fact, Kruger, who was said, as I, no death penalty for anyone, gets three and a half checks. Yes. She said that on her jury questionnaire, and if you read the voir dire of Mrs. Kruger, she was much more willing to set aside her views. I mean, there's really a contrast between her position in her questionnaire and actually the position that she took in the voir dire. Did she wind up on the jury? Excuse me? Did she wind up on the jury? Yes, she did. Mrs. Kruger did. And she was rated positively, but her review of her voir dire, especially, and the magistrate judge did an examination of that, indicates that she was much more decisive in her discussion and her ability to say, yes, I can follow the law. I wouldn't have a problem with that. And getting back to Mrs. Clark, the sense of her was, again, just trying to draw inferences from the records, that Mrs. Clark was somebody that liked to follow the rules. She had gotten angry, described a circumstance in one of her prior services, jury services, where somebody had, one of the jurors had said, oh, we need to do this or we should do this, and she got angry that they were not following the rules as according to what the judge had told them to do. So Mrs. Clark came across as somebody who, though she had problems with the death penalty, was somebody that cared a lot about following the rules. What is the government's position at this point about the application or non-application of mixed motive? And I ask this question because, obviously, in Kessler v.  of mixed motive, and I'm not sure what the standard would be taking now. You being the state of California. Well, I would imagine, I think, Your Honor, that I guess the certainly under these circumstances, we don't, we're not saying that the district court erred or the magistrate judge erred in choosing to apply mixed motive analysis. And what I understand that means is, what's critical about that is a burden shifting. In other words, that although ordinarily at the third stage, the burden is on the petitioner. Yes, Your Honor. The, once you established that there was a mixed motive, I gather that what the district court did was then shift the burden onto the prosecution to prove that it would have been, they would have done it anyway. Yes, Your Honor. And he believes they satisfied that. But do you accept that sequence? That certainly would be consistent with the way the United States Supreme Court has applied mixed motive analysis in Title VII circumstances. Correct. But as I recall, maybe I'm wrong, the California attorney general was up here vigorously arguing to the contrary in Kessler v. Camber. Am I wrong about that? Your Honor, I'm afraid that I didn't review the briefing and the position and didn't talk to the judge. I think the, again, I'm not sure, certainly an evaluation of how mixed motive analysis should be applied in the Batson context is an open question in this Court. The United States Supreme Court has not addressed the question. And as we point out, however, I think ultimately the situation or the, we do run into at some point a potential Teague problem with the application of mixed motive analysis in the Batson stage for the, for example, if this Court were to say mixed motive analysis doesn't apply or it applies in a particular manner and therefore the state of California loses. I mean, that's because then that would be establishing a new rule, a particular rule of how mixed motive analysis should be applied in the context of the Batson situation, which this Court in, both in Kessler and in Johnson v. Gomez, I believe, indicated was an open question in front of this Court. And clearly the United States Supreme Court has not addressed it. But that aside, ultimately, as both the magistrate judge found and the district judge found in this Court, that whether Mrs. Casey actually deserved a 4X rating, that she at the very least deserved a 1 or a 2X rating. And the prosecutor was in analyzing and looking at the pattern and how he exercised his peremptory challenge, he followed his rating system. So if a juror had, and ultimately, in the end, no jurors that had an X rating sat on the jury, he was able to get everybody who he felt were positive jurors. And so whether Mrs. Casey deserved 1X or 2Xs or 3Xs or even 4Xs, she was, in the words of the magistrate judge, when we argued this case in front of him 10 years ago, she was history. She was going to be gone. Well, that sort of has a shaky premise, I would think, because if your assumption is that but for a racial motivation, she would have been, like Clark, on the positive side with a checkmark, then that sort of goes out the door. The question is whether it was 1 or 4Xs. If the X was attributable to her race, then she wasn't going to get on the jury for an impermissible reason. Now, it may be that there's less of an inference that he is loading his negative based on race if there are fewer than 4, but I don't take the point that because he did give her at least, if he had given her at least 1X, at the end of the day, she wouldn't have gotten on it, because that sort of begs the question, it seems to me. Well, I think ultimately it gets us back to the question of the trial court that reviewed Mrs. Casey and found that he expected a preemptory challenge, and he felt that she was indecisive and had problems with the death penalty. How do we fit that into the structure of Batson analysis? We're saying he didn't find there was a prima facie case. He makes those observations, so what we're basically doing is importing commentary and reasoning that's flawed because he's using a wrong standard, and there clearly was enough, I think, for a prima facie case. Assuming that, then how do we transpose his reasoning into a justification for an articulation that the prosecutor never gave? Right. Well, one, I believe that the evidence or the record doesn't support the conclusion that the trial court in this case used the wrong standard. But didn't Johnson say directly to the contrary? I mean, didn't Johnson say flat out that the trial, whether the trial court thought there were reasons is just irrelevant because the question is what the prosecutor's reasons were, not what they could have been? I mean, isn't that what Johnson was about? Well, if that's what, well, and Johnson sided with approval of Paulino versus Castro, which also came to the same conclusion. But another thing that Paulino concluded in that case was saying when there's only one juror that's a question, the trial judge, it's appropriate to consider the circumstances and reasons why that juror could be excused. So Paulino expressly stated that. It's not like it's a, I mean, if we're looking for reasons, you can look in the record for the reasons. The question is should any weight being given to the fact that the trial judge recognized these reasons. And on that, I don't see why we, under the current circumstances, we, that's entitled to any weight. I mean, the reasons he came up with weren't secret reasons. I mean, they were, in fact, it turns out that they were actually on the defense lawyer's form. So we don't have to worry about digging up secret reasons. But why does it matter what the trial court thought about it? Because the trial court is the one who is there viewing the voir dire, viewing this juror, evaluating it. The trial court should not turn a blind eye to circumstances or characteristics of the juror which would indicate that they're not a good juror. But we know the trial court made a mistake on a constitutional basis as to whether there was a prima facie case. He just was wrong about that. Do we disagree, Your Honor? Well, you have to. He was applying the wrong standard. Well, there's no indication that he was applying the standard. He didn't say that he was applying the more likely than not standard. It was a Wheeler motion, and it was applying the Wheeler standard, and the Wheeler standard is the wrong standard. Well, whatever strong likelihood meant at the, the California Supreme Court had never clarified at that time, and this predated the Fuller decision, that strong likelihood was anything different than reasonable probability. But Johnson doesn't make that distinction, does he? Well, then subsequently the California Supreme Court and Johnson said, the California Supreme Court said, yes, they're the same, and reasonable likelihood and, or strong likelihood and reasonable probability mean the same thing, and that means more likely than not, and that was wrong. And the United States Supreme Court looked. But at the time that the trial court acted in this case, there was no indication from the California Supreme Court or any court of appeal in California that strong likelihood meant anything different than the Batson standard. So are you arguing that Edpa 2254d-1 applies to this because even though the Supreme Court ultimately decided that the California standard was wrong, maybe the trial judge applied the right standard? Is that what you're saying? Yes. And there's no indication that the trial court applied the incorrect standard, and that's exactly what they decided. There's also no indication that he applied the right standard either. Well, in the context of Edpa, then we should presume that the state court applied the proper standard. But actually there is an indication that he applied the wrong standard, because what he did was come up with reasons why it might have been okay. That's not the right standard. That's exactly what Johnson said shouldn't be getting done. In other words, the way he seemed to resolve this is saying, I'm not going to take the wheel in motion. I'm not going to go to the next step because I can see some good reasons. And that's exactly what Johnson said not to do. That's exactly what Johnson said not to do when you've got a statistical disparity which on its face establishes a primary case. No, no. But it's a methodology. He never even got very far into the question of statistical disparity or other circumstances, because instead he just came up in his own mind with possible reasons and said, well, I can come up with possible reasons, so that's the end of it. And that's what Johnson said is wrong. Johnson said that was wrong. But I would go back to this Court's discussion in Paulino v. Castro where the Court indicated, while we may consider whether the record contains entirely plausible reasons, why a prosecutor may have exercised peremptories, such reasons have usually helped persuade us that the defendant made no prima facie showing where the defendant challenged the excusal of just one juror. So in Paulino, this Court indicated that when you're talking about just evaluating the challenge of one juror and not trying to shoot down, in Paulino I think it was 5 out of 6 challenges. In Johnson it was 3 out of 12 of the prosecutor's challenges. A full quarter of the prosecutor's challenges were used against African Americans in the Johnson case. That when you reach that kind of a bare statistical disparity, that the judge can't go back and say, well, juror 1, 2, and 3, there's reasons for all of those. But as to evaluating the validity of a prime — the existence of a prima facie case when we're talking about just one juror, Paulino indicates that that's appropriate. And that's exactly what the trial judge did in this case. And so then if, you know, the trial court — obviously Paulino occurred after that, after the trial in this case. Certainly this Court has found that it was an appropriate exercise to do that when you have — when the basis of the prima facie case is the excusal of just one juror, then it was certainly reasonable for the trial court at the time to do that. And People v. Johnson was a direct appeal case. So it doesn't — didn't have the — the limitations of Teague or of the AABPA to limit the court from declaring what the law was. And so to the extent that Johnson has now cut that off, that would be a new rule that wasn't clearly established at the time that the trial court in this case acted. Can I ask one — just to switch gears entirely for a minute and just ask a question about the Shackling issue. Are you prepared to — I certainly am. Reading — the one thing that troubled me about the Shackling issue was reading through the — the trial transcript on the evidentiary hearing and realizing that the jurors really noticed it. I mean, it was 14 years later or however long it was, and these jurors could tell you — they didn't seem to remember a whole lot else, but they could tell you in great detail, you know, when they noticed it, how they noticed it, and so on, which suggests — you know, and I've always been a little skeptical about how much impact this really makes on jurors, but it certainly made you feel that it was really making an impact on them. And I'm just wondering, you know, in light of that, I understand the counterargument is essentially — what the district court found was that it was — there was no prejudice because they already knew he was an escapee and so on. But maybe this just, you know, reinforced the significance of all of that. I mean, when you have — you have one woman saying, well, I was really glad he had — they had it because I was afraid he would — he would hurt me. So it's sort of — why doesn't it do exactly what the concern is with regard to shackling in this circumstance? Well, I think we — I mean, there's certainly different interpretations about how that affected the jurors. Obviously, they were asked about shackling in 1993 and revisited that question, and then they were asked again in 90 — 2005. Well, I think some of them were asked in 93, but more of them were asked later. Yes. Right, right. And a number of them indicated that — some of them indicated they didn't see anything, but they remembered that he was the way he stood. And so I guess the question ultimately, however, comes back down to what the district court ruled in this case, that under the guidelines established by the United States Supreme Court and DAC, that this was an appropriate use of restraints. But actually, that isn't what he ruled. Isn't what the district court ruled, was that it was not, but that it wasn't prejudicial? No. He ruled on that on his motion to — which he initially ruled that it wasn't prejudicial in his — in his rejection of the — of the claim. And then DAC occurred. And then based on DAC, on his motion to — on Mr. Crittenden's motion to alter or amend the judgment based on DAC, he reconsidered and said, yes, I recognize now that DAC controls. And this certainly — the trial court in this case made appropriate findings of a need for security measures as required by DAC and took appropriate steps to ensure — I see. So it didn't ultimately go off on a prejudice question. Correct. Okay. The one thing I want to be clear on from your perspective is what is the narrow question that we must decide regarding Batson? The narrow question. I think the narrow question that this court has to decide is whether the district court erred in concluding that a — that the juror would have been excused regardless of her race. And that is what the district court ultimately concluded in this case after reviewing the record of the evidentiary hearing and of this case. So ultimately, that is the question that's in — that is in front of this court. That's what the district court held. The district court said, I find discrimination, but that discrimination that may have led to four Xs was not the controlling reason. The controlling reason was that Mrs. Casey was against the death penalty. She was indecisive. She wasn't a good juror. And that's the reason why the prosecutor excused her. And — But, you know, when you put it that starkly, which is the right way to put it, it seems to me, how can you say that given Clark? I mean, I'm very impressed with the fact that there were lots of people who were challenged who seemed to go beyond some continuum in which she was either in the middle or on the high end. But if the question is what — literally whether she would have been challenged, anyway, we have Ms. Clark out there, Mrs. Clark, who wasn't challenged. Correct. And so you have to then say that it's sufficient for, more likely than not, finding that there is some distinction between her and Mrs. Clark that would have made her challenged and Mrs. Clark not challenged. Again — More likely than not. Right. Again, I think it comes back to that, all things being equal, everybody that's reviewed, all the courts in reviewing this process, everybody seems to think that Mrs. Clark deserved one or two Xs. I know. And you may be right that she's an anomaly, but that's why it's interesting what the real question is. The real question is, would she have been challenged? Well, she could have been an anomaly, too. How can we say that she would have been challenged? Well, there are differences between Mrs. Clark and Mrs. Casey. And I think that we've articulated the differences, which would indicate why the prosecutor would have favored Mrs. Clark in the long run, in the continuum, in weighing her against Mrs. Casey. And because Mrs. Clark had served on a prior jury before, that she felt that it was a positive experience. I've also already spoken about that her belief about that she seemed to be a juror who was focused on following the law, and that was an important aspect to her. And by — and the prosecutor, I think, was reasonable in inferring that she'll follow the law in this case. She'll follow the law. She'll ultimately be able to set aside — If there wasn't an absolute pattern in which he challenged everyone of that variety, how could you reach the conclusion that she would have been challenged? I guess that's what I'm asking you. I mean, if we had no outliers, it seems to me that you would have to prevail. And I would say, looking at the record, that most people of her general configuration, almost all of them, were challenged, but not all of them. So how can you say that? Well, I guess the question is, is it sufficient to overturn the finding of the district court that she would have been excused? Is the existence of one or two anomalous ratings sufficient to overcome and outweigh the fact that the prosecutor did rate negatively the vast majority of the prospective jurors who expressed hesitancy with regard to the death penalty? And also, if you look at — if you go all the way back to the motion filed in the trial court, where the defense counsel put together their comparison of the jurors, and they identified 25 jurors in the original panel of 50, and included Mrs. Clark in that, and identified 25 jurors, and said, the prosecutor — and indicated, the prosecutor is likely not going to be able to excuse all of these people. The prosecutor is going to have to make some considerations, and he's going to have to put some one or more of these hesitant death penalty jurors, because he probably isn't going to be able to — he only has 26 challenges. Twenty-five over half of — half of the panel that's sitting in front of him has death penalty hesitant views. And so he's going to have to make some — But, Mr. Christopherson, your argument would make more sense if he used every one of his challenges, wouldn't it? If the prosecutor used every one of his challenges? Yes. He did, didn't he? I believe he — No, I don't think he did. I believe he — I don't know. I assume that he didn't. My recollection was he didn't use every one. Maybe he did. I'll check and see. Okay. I know that the defense — Your court counsel is nodding that he did use every one. I think he — He answered them. Yes. He had passed a number of times, but then as the defense kept exercising, I think he eventually — yes, as I recall, because the last two or three were exercised just by the defense. I think he was done at that point. And he actually was finished with his preemptories at the end. So, in closing, as I started this process, every judge that has looked at Mrs. Casey has concluded that she was not a — wasn't a positive, wasn't a good juror, a juror that the prosecutor would have wanted on this jury. And that fact, the findings by the trial judge, by the magistrate judge and the district court all support and really undermine and make it very difficult for Mr. Crittenden to carry his ultimate burden that she was excused because of a discriminatory purpose. If the Court has no further questions, I'd submit. Thank you, Your Honors. A few brief points. First of all, with regards to the reason referenced regarding indecision or indecisiveness, if you comb the deposition of this prosecutor, if you comb the evidence you're hearing, you'll never see that word. That was not something he cared about. It was not something he spoke of. Likewise with the focus on the law argument. You won't find that anywhere in any of the testimony we've heard. I'm not sure that the reason referenced in this case was that the jury was not satisfied with the problems that had been raised by the prosecutor regarding these reasons. All right. But let's suppose — I'm just really trying to think hard about this more likely than not standard, which I understand you don't agree with. But if we were doing that, and then you can look at it one of two ways. I mean, one is that Clark stayed on the jury despite a similar profile, so how do we know that she wouldn't have been an anomaly, too? And the other — but the other way you could say is, well, you know, most of the people with this profile were preemptively challenged, except for Clark, so why can't we say it's therefore more likely than not, because most of them were challenged? Well, in addition to Clark, there was also Kruger, who sat on the jury. I think her views are also very hard to— Well, but she was quite definitive. She didn't waffle at the point here. No death penalty for anyone. When she wrote her questionnaire. When she wrote it. And then she brought up the fact that she was from Texas, didn't want to be viewed as anti — as someone who was pro-death penalty in that extreme way and so on. And so she spoke about that, brought that sua sponte to the Court's attention, to everyone's attention, regarding her views. But if we go down — there are several other jurors, and I would direct the Court's attention to the district according to court opinion at the excerpts of record at 925. Three jurors who were excused but who were rated with positive checkmarks. Tenney's probably wouldn't vote for the death penalty was his comment on her. Two checkmarks. Sullivan, two checkmarks. Automatically vote for Elwap in every case, never for the death penalty. Fisher, one checkmark. Given the choice, he would generally choose Elwap over the death penalty. But they were all challenged. They pardon? They were all challenged. They were challenged. And they were all later, too, weren't they? But if this jury— Just to be clear, were they all after her, too? No. Some of them were before her, in fact. I see. They were before her. At the evidentiary hearing, the prosecutor, and this is at 751, 752, and 95 to 96 of the excerpts of record, there are three more jurors. Mr. Dale received three checkmarks. The notation on the questionnaire was that he thinks the death penalty is, quote, extreme. Mr. Wright or Ms. Wright, two checkmarks. She thought it was a hardship for people to sit on death row. Shally, one checkmark. Wouldn't want to recommend death. So this anomaly argument doesn't fly. What you see is the prosecutor had a number of people whom he gave positive ratings to. But just a minute. But that doesn't seem to me to be the relevant question to the question I was asking. These people were all ultimately challenged. Yes, they were. Okay. So the question I'm asking is, assuming that race was a factor, and that accounts for the four X's, what about the question of whether she would have been challenged anyway? And if we now have this huge array of people who had similar views and were challenged, and then we have one or you may say two who had similar views and weren't challenged. So if the question is more likely than not, why doesn't he lose? Because the existence of those jurors cannot be taken out of the equation. Clark and Kruger had the same views. They're indistinguishable other than race. It's the only factor that can explain a distinction between Clark and Kruger on the one hand and Casey on the other. And that's the purpose of comparative analysis. We have no other way of determining that. Kennedy, you have one other thing on the equation is Casey had a transportation problem. Well, when we go back and look at it, at the very end she said that her husband was in a carpool and two days a week it was his turn to drive, and the judge says we're going to have to carpool jurors from your neighborhood anyway coming to court and we'll arrange for the bus schedule so you know how to get there. And she said fine and walked out the door. I don't think this was a serious transportation problem on her part. It just people say this all the time. I'm not having a car to get someplace sounds pretty serious. Pardon me? Okay, I think. Thank you. The case has been very well argued and well braved. We appreciate it. And the argument is over. And we will submit the case. Thank you all for your appearances today. We will stand adjourned. Thank you.
judges: Farris, Fisher, Berzon